1            IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    DEBRA JONES, et al.,                  )

5             Plaintiffs,                  ) Case No.

6                vs.                       ) 13-227L

7    THE UNITED STATES OF AMERICA,         )

8             Defendant.                   )

9

10

11                      Courtroom 6

12        Howard T. Markey National Courts Building

13             717 Madison Place, N.W.

14                 Washington, D.C.

15             Thursday, April 12, 2018

16                    2:30 p.m.

17          Oral Argument on Spoliation

18

19

20       BEFORE: THE HONORABLE MARIAN BLANK HORN

21

22

23

24

25   Jen Metcalf Razzino, CER, Digital Reporter

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3            JEFFREY S. RASMUSSEN, ESQ.

4            Fredericks, Peebles & Morgan, LLP (CO)

5            1900 Plaza Drive

6            Louisville, Colorado 80027

7            (303) 673-9600 / (303) 673-9155 (fax)

8            jrasmussen@ndnlaw.com

9

10

11   ON BEHALF OF THE DEFENDANT:

12           TERRY PETRIE, ESQ.

13           JODY H. SCHWARZ, ESQ.

14           U.S. Department of Justice - ENRD

15           999 18th Street

16           South Terrace, Suite 370

17           Denver, Colorado 80202

18           (303) 844-1369 / (202) 353-2021 (fax)

19           terry.petrie@usdoj.gov

20

21

22   ALSO PRESENT:

23       Christopher Donovan, Esq., FBI

24       James Porter, Esq., U.S. Department of Interior

25
```

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
 1                    P R O C E E D I N G S
 2                      -   -   -   -   -
 3            (Proceedings called to order, 2:45 p.m.)
 4            THE COURT:  Good afternoon.
 5            COUNSEL:  Good afternoon, Your Honor.
 6            THE COURT:  The case on the docket is Debra
 7    Jones, et al. against the United States, case number
 8    13-227.  And this is a hearing to try to determine how to
 9    move forward.  Let me first start by asking counsel of
10    record to introduce themselves and also anyone else who
11    may be at counsel table with them.
12            Let's start with the Plaintiff.
13            MR. RASMUSSEN:  Jeffrey Rasmussen for the
14    Murray Family and Debra Jones.  Debra Jones is here with
15    me and her husband, Jason.
16            THE COURT:  Very good.  Thank you.  Welcome.
17            MR. PETRIE:  Good afternoon, Your Honor.  Terry
18    Petrie for the United States.  I'm joined by Jody
19    Schwarz, also from the Department of Justice.  We also
20    have at table Mr. Christopher Donovan on the left, and
21    he's counsel from the FBI, and also Mr. Jim Porter from
22    the Department of Interior Solicitor's Office.
23            THE COURT:  Okay, very good.
24            We all know why we're here.  We have a remand
25    from the Court of Appeals for the Federal Circuit that
```

EXHIBIT A

Debra Jones, et al. v. USA                                   4/12/2018

1    found essentially that they did not agree with the issued

2    preclusion dismissal decision that I had issued on July

3    30th of 2015.  The Federal Circuit's opinion was issued

4    about a year and a half later on January 27th, 2017, and

5    essentially sent the case back to this Court rejecting

6    the basis of issue preclusion for this trial court's

7    decision.

8           There are many things about the Circuit's

9    opinion that leave us here today basically starting from

10   scratch.  When you take away the issue preclusion, that

11   means essentially that the decisions and the lengthy

12   decision of the Federal District Court and the appeal

13   decision affirming that District Court decision are not

14   necessarily the basis of the facts that we will go

15   forward with here in this Court.  It will be very

16   interesting and very difficult, I think, to retry factual

17   issues that now date back a considerable amount of time.

18          The Circuit -- the Federal Circuit which sent

19   this case back to us essentially took the position that

20   if you strip out the issues that were decided by this

21   Court and affirmed by the 10th Circuit that we have to

22   start not with those decisions which did find spoliation

23   didn't change the nature of the situation, but that we

24   have to start with spoliation as our first issue, which

25   is the issue that's been briefed prior to today's

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    get-together, so to speak, which I view as talking about
2    the spoliation issues, but also talking about where we go
3    from here.
4            The Court indicated that once this Trial Court
5    looks at the issues of spoliation, then, in fact, this
6    Court -- and I'm quoting now from the opinion.  "If the
7    CFC concludes on remand that the spoliation sanctions are
8    not appropriate or that the appropriate sanctions would
9    not change the evidentiary landscape for particular
10   issues, the CFC may reconsider the application of issue
11   preclusion.  If it determines the sanctions are
12   appropriate and do change the evidentiary landscape, the
13   CFC should independently consider Jones' substantive
14   allegation of bad man violations."
15           So if we look at that, basically, as I
16   understand it, it leaves us with a number of courses that
17   we have to go down.  Now, clearly, we have to deal with
18   whether spoliation sanctions are appropriate.  The
19   Plaintiffs' papers, although asking for spoliation
20   sanctions -- and, Mr. Rasmussen, that's one of the things
21   that I'm going to want to hear much more specifically
22   from you is what sanctions you're really asking for.  You
23   just sort of say sanctions with the -- in your briefing
24   with the understanding that sanctions would essentially
25   result in a win for your side.  But that's necessarily

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    true according to the Federal Circuit and, therefore,

2    can't be necessarily true for me either.

3           So we kind of have to go through a multifaceted

4    process at this point which is are sanctions appropriate.

5    If so, what should those sanctions be.  What's the impact

6    of all global sanctions, of limited sanctions, of

7    individual sanctions, if any, and then if it's not a

8    global sanctioning which says essentially that it kicks

9    in the bad man statute, then we have to essentially retry

10   the case.  And as I said earlier, that will be a

11   challenge to say the least.

12          Even on the spoliation sanctions, we've got

13   some problems in deciding what is and what isn't

14   factually accurate.  The Circuit's factual statement was

15   very abbreviated, very summary, and even has in it some

16   conclusions that are not attributed to a particular

17   witness, but read like the conclusions of the Circuit.

18   And one of those that makes, I think, our lives for the

19   future quite difficult is in describing the exchange of

20   shots between the officers and the running Mr. Murray.

21   There's a statement without attribution that says all of

22   the shots missed.  Now, that's obviously a very relevant

23   statement to what we're here to do.

24          And I don't want to minimize, particularly not

25   with Mr. Murray's family here in the room, the loss that

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    you all endured is real.  We understand that.  I don't

2    even know how, as a parent, to say to you what you must

3    have gone through and still are going through, but that's

4    not the job of this Court in the sense that as much

5    empathy and sympathy as I may feel, I've got to follow

6    through to what, in fact, happened, which will be very

7    hard to figure out given the facts of this case, and also

8    figure out whether under the facts of this case the bad

9    man statute is triggered.

10          This is not a court of equity; this is a court

11   of law.  We can't decide the case on the basis of equity.

12   If it comes down to me deciding the case in another

13   written opinion, the question will be, I think, probably

14   at this point as I look at it, the inevitability of

15   trial, with missing witnesses and everything else.  I do

16   not agree with the Government that you're going to be

17   able to resolve this with another motion to dismiss.  I

18   don't see that at this point.  But, you know, we will be

19   talking about that down the line.  I'm not ruling it out.

20   So what I would say to the Government is I don't see it

21   now.  What I would say to the Plaintiffs, it could kick

22   back in and come back in as a force.

23          But I am somewhat confounded as to how we

24   figure out basically who shot whom.  As all of you know,

25   this was difficult the first time and it's equally

EXHIBIT A

Debra Jones, et al. v. USA                                4/12/2018

1   difficult now.  I'm not condoning -- and you will find in
2   my original opinion some concern about how some of the
3   evidence was handled.  I do have a law enforcement
4   background, way, way, way back, but that's how I started
5   my career, in law enforcement, as a prosecutor, as a
6   lawyer and a prosecutor.
7            Would I have handled the evidence the same way?
8   Probably not.  But I say probably not and I also say that
9   it's very hard to reconstruct something this many years
10  after the fact, especially, you know, if we have to
11  basically revisit -- even though the Circuit said we
12  could reconsider issue preclusion once we get past
13  spoliation -- this is almost like we have to go through a
14  formality of spoliation before we can get to the rest of
15  the case.
16           I don't see a clear way.  Right now, if you
17  were to ask me, I would say we'll go to trial.  Is this a
18  good case for you all to get together and try to figure
19  something out?  Is this a good case for ADR?  Possibly.
20  Is there a potential for really lousy precedent on both
21  sides here?  Absolutely.  You know, I understand where
22  the Plaintiff here and the family would feel compelled to
23  go forward.  This is not going to be a short process by
24  any means.  And from the Government's perspective, this
25  could create really horrible precedent.

EXHIBIT A

1            As you all know, I also have a background at
2     the Department of Interior.  I am probably as well
3     equipped to deal with these issues as I could be in terms
4     of background.  You know, I've dealt with hard cases out
5     of the Department of Interior both here on the Court and
6     also when I was their Acting Solicitor and Deputy
7     Solicitor.  But what we're really facing here is not a
8     quick process.  I don't know the answer to whether there
9     was spoliation or not.  I know that it wasn't maximally
10    ideal handling material, of the body, of the clothes, of
11    the gun.  But it -- let's take the gun for a moment.
12    When you have multiple law enforcement agencies involved,
13    there are things that do happen.  Were they permissible?
14    I don't know.  That's the sort of detail at which I think
15    the Court is going to have to put its mind and sort
16    through each of these individuals.
17            I'm not sure that I feel that the briefing I've
18    gotten on spoliation, frankly on some of the specific
19    issues is focused or precise enough, having read the
20    briefing.  And, of course, one of the major issues is
21    what do you really want here?  Do you want -- if you
22    don't get it all, where are your compelling points from
23    the Plaintiffs' side in terms of individual items of
24    spoliation?  If, for instance, you say, sure, they
25    shouldn't have done X with one of the objects that's

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    involved here, a piece of clothing or whatever it might

2    be, does that trigger a full automatic walk into the dead

3    man statute?  And I don't know that it does necessarily.

4          So you -- we find ourselves in a situation here

5    that as you talk about spoliation today, be very focused

6    on each of the things and think and bear in mind

7    whether we come to a conclusion today or whether we

8    come to a conclusion later on as to how you think once

9    you get a spoliation decision we will be proceeding.

10   You know, we do trials, that's what we do.  And

11   usually I can conceptualize the trial pretty quickly.

12   I mean, I've been a litigator all of my professional

13   career on and off until they kicked me upstairs

14   periodically for management.  But even then, I was

15   supervising litigation.

16         And then coming to the Court, which I've now

17   been on for over 30 years, I don't see this one clearly

18   yet.  So I'm going to need your help in figuring it out.

19   But what I don't need is both sides digging in in such a

20   way that you all can't work together to figure out how to

21   get there from here in the most economic way, because

22   litigation is expensive obviously, in the most economic

23   and in the most realistic and in the most sensible way to

24   get a result.

25         If this were an equitable case, it would be

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    easy.  It's not; it's a legal case.  So, you know, there

2    is certainly a compelling story to be made, but it has to

3    be a legally significant compelling story to get a win

4    for the Plaintiffs.  So I don't know -- and, certainly,

5    Mr. Rasmussen, you should take some time, at some point,

6    to explain what I've said.  Not that the English words

7    are hard to understand; they're not.  The legal issues

8    are hard to understand for nonlawyers and I hope that you

9    will feel free through your attorney even today -- for

10   the Plaintiffs to feel free to pose questions so that I

11   can try to explain it more if it hasn't been clear.

12          This is not your sort of standard case because,

13   frankly, everyone in this, including the Court of

14   Appeals, that nobody will ever really be able to

15   determine who shot whom.  And with that, it becomes quite

16   difficult.  So that's just not something we're going to

17   know today with any kind of certainty.  Whether

18   presumption kicks in or something of that sort, that's a

19   different issue.

20          So let's talk first and foremost about

21   spoliation and, Mr. Rasmussen, I guess you're up first.

22          MR. RASMUSSEN:  Thank you, Your Honor.

23          I wanted to just briefly talk about a few

24   pieces of -- two pieces of evidence and then something a

25   little more subjective, I guess, before going into this.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    If we can pull up the screen for the Court.

2              THE COURT:  Are we on?

3              MR. RASMUSSEN:  There we go.  This -- I'm not

4    sure what those green lines are, but this is the --

5              THE COURT:  The green lines should be -- we

6    ought to be able to remove them.

7              (Pause in the proceedings.)

8              MR. RASMUSSEN:  This is the gun that Officer

9    Norton says Todd Murray used to kill himself.  And one of

10   the things we're talking about when we're talking about

11   spoliation is when we look at this gun, we don't see

12   blood on it, we don't see tissue on it.  We have the

13   doctor saying this gun would be covered in blood and

14   tissue if it were the gun that shot Todd Murray, and it

15   isn't.  And that's -- that's --

16             THE COURT:  It isn't at what point in time?

17   When was this picture taken?

18             MR. RASMUSSEN:  This picture was taken at the

19   scene.

20             THE COURT:  Okay.

21             MR. RASMUSSEN:  Yes.

22             THE COURT:  And we all agree on that?

23             MR. RASMUSSEN:  Yes, this is -- I believe it's

24   Exhibit 19 in our --

25             THE COURT:  In the District Court case?

EXHIBIT A

1          MR. RASMUSSEN:  Well, it was in the District
2    Court, but I believe it is Exhibit Number -- no, sorry.
3    I believe it was Exhibit 19 in this case if I recall
4    correctly for our spoliation motion.
5          THE COURT:  Mr. Petrie, is this the picture --
6          MR. PETRIE:  It is.
7          THE COURT:  -- concurrent picture of the gun?
8          MR. PETRIE:  Yes.
9          THE COURT:  All right.
10         MR. RASMUSSEN:  And that's -- that's one of the
11   things we're talking about when we talk about spoliation.
12   This gun is lying there and it looks like it has just
13   been set down.  It does not look like the weapon that was
14   used to kill Mr. Murray.
15         THE COURT:  Rather than press your head back
16   like that, just turn the screen so you can see it.  It
17   should just be turned -- you ought to be able to see it
18   so that both of you can see it unless you're looking over
19   here.  There's screens all over the place.
20         MR. RASMUSSEN:  Yes.  And so, you know, as we
21   say in our motion, we can't tell for sure what happened.
22   This doesn't look like a gun that was used to kill Todd
23   Murray.  There wasn't testing done on it.  There wasn't
24   testing to see if there was any blood on it, any tissue
25   on it.  It certainly doesn't look like it, but it wasn't

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    tested.

2              THE COURT:  Now, if there were blood on it or

3    not --

4              MR. RASMUSSEN:  Mm-hmm.

5              THE COURT:  -- would that be definitive one way

6    or the other to say at what distance from -- and I

7    apologize for the goriness of this to the family, I

8    really do, but these are questions that have to be asked.

9    Will we ever know or do we know whether it was put up

10   against the head or whether it was a couple inches back

11   where there may or may not have been blood on it?

12             MR. RASMUSSEN:  The --

13             THE COURT:  I did try murder cases at one point

14   in my life.

15             MR. RASMUSSEN:  Yes.  And the -- what the --

16   there wasn't an autopsy, but what the physical

17   examination of the body -- the conclusion there was this

18   was up against his head, that it would have -- that

19   whatever weapon was used to do that and the hand of the

20   person that was pulling that trigger would have been

21   covered in blood.

22             THE COURT:  Well, there was also the crossover

23   body issue.

24             MR. RASMUSSEN:  There is not, yes.

25             THE COURT:  There is that as well.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1            MR. RASMUSSEN:  Yes.

2            THE COURT:  But how do I get from A to Z, in

3    other words?  How do I say, okay, the absence of blood on

4    the gun in this picture --

5            MR. RASMUSSEN:  Mm-hmm.

6            THE COURT:  -- which was taken at the scene and

7    who knows how quickly and who knows who might have wiped

8    it and who knows -- there's just so many "who knows" in

9    there.

10           MR. RASMUSSEN:  Mm-hmm.

11           THE COURT:  What do I do with that in terms of

12   saying as to who was responsible for the spoliation?

13           MR. RASMUSSEN:  Well, what we have is that the

14   officers have said that this gun wasn't wiped down, this

15   is how they found it.  So we don't have those issues with

16   this gun.

17           THE COURT:  But at what point?  But at what

18   point?

19           MR. RASMUSSEN:  They found it when they went --

20   I'm not sure about Officer Norton, but the other two

21   officers say that when they got there, the gun was lying

22   there on the ground and that it -- then they -- and as

23   you will see in a second, they said, let's not touch

24   anything here -- down here.  Officer Norton still had

25   this gun, so that could have been cleaned.  But this gun

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    -- there's nothing to suggest that anything was --

2              THE COURT:  So you're taking that from -- those

3    facts from the District Court opinion or from a

4    simultaneous report of the officers or from where are you

5    taking this?  One of the things we're going to have to be

6    super careful about in this proceeding is to know where

7    we're getting a statement from because we've just been

8    told that we can't use issue preclusion.

9              MR. RASMUSSEN:  Mm-hmm.

10             THE COURT:  So it's not a very easy sort of map

11   to navigate here.

12             MR. RASMUSSEN:  Right.

13             THE COURT:  So where did you take that

14   statement about the officers from?

15             MR. RASMUSSEN:  That statement is taken from

16   the officers' deposition testimony and it is -- so that

17   is their version of what happened.  We, of course, don't

18   have -- you know, we can't confirm that.  There's a whole

19   lot of uncertainty, I think, as to exactly what happened.

20   But their testimony was that this gun -- this is how it

21   was found.  It's lying there on the ground not that far

22   from where Todd Murray is lying.

23             THE COURT:  I guess what I'm saying to you is

24   -- and that's one of the things I want you all to do as

25   sort of supplemental briefing, is to attribute each of

EXHIBIT A

1    your statements that you've said prove whatever it is

2    that you think it proves or does not prove and indicate

3    to me from where it comes, from whence it comes, because

4    we've got this problem is we cannot accept on faith

5    anything out of the District Court opinion.

6            MR. RASMUSSEN:  Mm-hmm.

7            THE COURT:  Very unusual situation.  But it is

8    what it is.

9            MR. RASMUSSEN:  Mm-hmm.  And I think when we're

10   talking about the gun and whether there was evidence

11   spoliated, with regard to that gun is what we got here is

12   the officers saying this is how it was found.  There's no

13   suggestion that they attempted to clean up the gun.  They

14   don't make any suggestion that they did anything of that

15   kind, this is how it was found, that it was kept in place

16   actually and then photographs were taken of it.  This is

17   a closeup photograph of it.  There are other -- numerous

18   photographs of it.  This is a closeup -- the closest

19   picture and it just doesn't seem to show any blood on it.

20           THE COURT:  Well, one of the things that I find

21   very interesting is that you have asked for a default

22   judgment.

23           MR. RASMUSSEN:  Mm-hmm.

24           THE COURT:  They're very rare as you know.

25           MR. RASMUSSEN:  Mm-hmm.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

 1          THE COURT:  I think this Court hasn't given any
 2   recently, and the one time where it was considered, it
 3   was obviated in the more recent -- the one more recent
 4   case that we do have.  Do you see everything here to so
 5   clearly demonstrate your perspective that you can support
 6   a default judgment here?  I'd like to get this one out of
 7   the way initially because I think -- and Mr. Petrie can
 8   address it, and I'm sure he will oppose it because the
 9   Government always does oppose default judgments against
10   it on some super-territorial grounds, as well as on the
11   rules, but the rules do allow for it, but it has to be
12   pretty clear.  And why is this a default judgment case?
13          MR. RASMUSSEN:  Well, what has to be clear is
14   that that is the remedy that will rewrite the scales in
15   the --
16          THE COURT:  We're not a court of equity,
17   remember; we're a court of law.
18          MR. RASMUSSEN:  Right.
19          THE COURT:  So the thing we have to figure out
20   is -- which I don't think we can -- the easiest way would
21   be who shot whom.  I don't think we can do that.  Then we
22   need to see what happened to each of these potential
23   pieces of evidence and who was the cause of it not being
24   treated in an ideal fashion or not tested or, yes, tested
25   or removed or not removed.  You know, there were some

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    things done to the body, obviously, that we have
2    unexplained as well.  But, once again, that would be an
3    equitable discussion as opposed to a legal one.  You
4    know, they did take that second sample of blood.  The
5    issue isn't that they took it.  The issue would be what
6    they did with it or didn't do with it.  So I think we
7    have to be super careful here.
8              MR. RASMUSSEN:  Mm-hmm.
9              THE COURT:  And I think given all the
10   confusion, frankly, or lack of definitive conclusions,
11   why default judgment is even on the table is, I guess,
12   what I'm asking you.
13             MR. RASMUSSEN:  Okay.  And I think the -- kind
14   of the simple answer is that's the only remedy that
15   really -- that really can bring the scales back level.
16             THE COURT:  Well, let me suggest to you that
17   you need to have a reason for a default judgment because
18   in a default judgment, if you remember, the rules are
19   very clear that it has to be clearly demonstrated to the
20   Court that that's the appropriate remedy.
21             MR. RASMUSSEN:  Right.
22             THE COURT:  And given all of the unclear issues
23   in this, it is not easy to conclude that it's clear that
24   a default judgment is correct.  So, I mean, unless you
25   have something more, we can move on.  I mean, I'm not at

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    a default judgment, obviously, from what you're saying.

2                 MR. RASMUSSEN:  Right, right.

3                 THE COURT:  But I'm willing to hear from you if

4    there's something that you can say to that point.

5                 MR. RASMUSSEN:  And the thing that I would say

6    to that point is that when we're looking, for instance,

7    at something like this gun and we're saying -- what we

8    have to do is we have to say what is the appropriate

9    sanction because of this spoliated evidence.  And when we

10   look at something like this we say, if this gun had been

11   tested and if it did not have Mr. Murray's blood on it,

12   as it appears, than Officer Norton's story is completely

13   false.  Then we know that.

14                THE COURT:  Why do we know that?

15                MR. RASMUSSEN:  Because that is his story.

16   This is the gun that was used to kill Mr. Murray.

17                THE COURT:  But -- correct.  But why do we know

18   that, A, the gun wasn't far enough away or at an angle or

19   at a place where it wouldn't have gotten blood over it,

20   or B, how do we know who, if theoretically -- and we have

21   no reason to believe it was, but if theoretically

22   somebody ran in there and wiped it, how do we know who

23   that was?  They haven't accounted for all the time in

24   between.

25                MR. RASMUSSEN:  Right.

EXHIBIT A

Debra Jones, et al. v. USA                              4/12/2018

1           THE COURT:  And so there's a time gap.
2           MR. RASMUSSEN:  Right.  And I agree with all
3     that.  I -- this gun, there's no suggestion at all or any
4     reason that anyone would have wiped blood off of it.
5           THE COURT:  But we -- that's my point.
6           MR. RASMUSSEN:  Okay.
7           THE COURT:  To get a default judgment, we
8     really can't be speculating.
9           MR. RASMUSSEN:  Right.
10          THE COURT:  Because you have to demonstrate to
11    the Court -- the rule is very clear.
12          MR. RASMUSSEN:  Right.
13          THE COURT:  You have to demonstrate to the
14    Court that that's the right away to go.  And I'm
15    paraphrasing, but with all of the vagaries here -- I
16    mean, I'm not saying you can't win in the end.
17          MR. RASMUSSEN:  Right.
18          THE COURT:  I have no idea, frankly, because we
19    haven't gone through all the analysis we will need to go
20    through either on spoliation or, if necessary, a trial.
21    But summary judgment or default judgment are very
22    specific things.  The Government would like a motion to
23    dismiss.  I don't think this is ever going to go to
24    summary judgment.  You want a default judgment.  I don't
25    see how you get to a default judgment at this stage of

EXHIBIT A

Debra Jones, et al. v. USA                                      4/12/2018

1    the proceedings under any circumstances.  And I'm being

2    totally candid with you.

3              MR. RASMUSSEN:  Right, right.

4              THE COURT:  I mean, that's why I'm saying, give

5    me your best shot.

6              MR. RASMUSSEN:  And our best shot and this is

7    what I view as -- that that is the appropriate remedy

8    here is that if the evidence -- even the basic evidence,

9    we can talk about some of the -- you know, we talk in our

10   brief about 11 different pieces of evidence and some of

11   them are really important and some of them are less

12   important and it's partially -- the whole list is to show

13   a pattern here.  But a couple of these pieces of

14   evidence, if very basic testing had been done, we would

15   know what happened.  We would know.  I believe that this

16   gun is one of those.  If it does not have -- and, you

17   know, we can look at it.  Superficially, it doesn't

18   appear to, but there wasn't the forensic testing to say,

19   oh, yeah, there definitely isn't any blood on this gun

20   that there would have been if it had been the gun that

21   shot Todd Murray.

22             THE COURT:  Okay.  I hear your argument.  We

23   can move on.

24             MR. RASMUSSEN:  Okay.  And so what we have then

25   is what do we do with some piece of evidence like this.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    If we had had that testing, this gun would either be

2    proven to be not the gun that shot Todd Murray or likely,

3    but not definitely, the gun that did shoot him.

4           We have the same thing with Officer Norton's

5    gun.  Again, very basic testing for that gun.  Was there

6    blood or tissue on it?  If there was blood or tissue on

7    that gun, that would definitively prove that that was the

8    gun that shot Todd Murray because the whole of his story

9    was he never got anywhere near Todd Murray and so there

10   would not be blood on his gun.  But they didn't do any of

11   those basic tests of the two guns that they say were shot

12   that day.

13          And so that's -- that's where when we have to

14   figure out what do we do with that and we have to say,

15   well, what is the appropriate remedy for the failure to

16   gather what could have been dispositive evidence -- basic

17   dispositive evidence, if we say, well, then they can't

18   use the evidence related to those guns or they can't --

19   our expert would be allowed to assume that the -- as the

20   gun looks -- appears to be that it didn't have blood on

21   it.  If our expert can assume that that gun does not have

22   Todd Murray's blood on it, then our expert can give an

23   opinion that is going to be pretty definitive.

24          THE COURT:  Well, but that's -- that's exactly

25   my point.  I mean, you may be able to get an expert,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1   although I honestly believe experts are quite malleable

2   sometimes.  But --

3              MR. RASMUSSEN:  Not ours.

4              THE COURT:  -- you may -- no, yours, of course

5   not.

6              MR. RASMUSSEN:  Right.

7              THE COURT:  And I'm not questioning it.  It

8   becomes a battle of the experts.  We all know how that

9   works.

10             MR. RASMUSSEN:  Right.

11             THE COURT:  Credibility and whatever.  But --

12   and some experts are very good and some experts blow you

13   out of the water immediately and you say, okay, that's

14   the one I believe.  But it's even more basic than going

15   to trial.  It may be -- and you've raised it, but I

16   thought of it -- it may be that even to figure out

17   spoliation, we do need those experts and we need to do a

18   hearing.  What's your response to that?

19             MR. RASMUSSEN:  I was thinking actually that if

20   we're talking, for instance, about being able to assume

21   that this picture -- that this gun doesn't have blood on

22   it --

23             THE COURT:  But you're assuming, that's my

24   problem.

25             MR. RASMUSSEN:  Right, right, and I know.  If

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    we assume that this gun doesn't have blood on it, I don't

2    know that the United States has an argument, and that's

3    the difficulty.  I didn't really see it as something

4    where we would even need an expert --

5              THE COURT:  Well, we'll find out, won't we?

6              MR. RASMUSSEN:  What?

7              THE COURT:  Even their papers suggest that

8    there's a problem.

9              MR. RASMUSSEN:  What?

10             THE COURT:  Even their papers suggest that

11   there is nothing that we can assume here.

12             MR. RASMUSSEN:  Well, but what I'm saying --

13   what we've got right now is, as far as I understand, the

14   evidence is everybody agrees that if this was the gun

15   that shot Todd Murray, it would have blood on it.  If we

16   can assume, as a spoliation remedy even, that it doesn't,

17   I think we're done.  And that's why I think it is where

18   the remedy is probably appropriately either directly as

19   just, well, we'll just grant default judgment or that --

20   have them come back with an expert who can say, oh, yeah,

21   even if this gun doesn't have blood on it, you know, it

22   still could be the murder weapon.

23             THE COURT:  So --

24             MR. RASMUSSEN:  I don't think they could do

25   that because I think -- what I've read in the evidence is

EXHIBIT A

Debra Jones, et al. v. USA                                4/12/2018

1    everybody agrees that the gun that shot him would have

2    blood on it.  That was one of the troubling facts in this

3    case was this gun doesn't appear to.  And if we had the

4    forensic testing --

5            THE COURT:  I don't get the sense that every --

6            MR. RASMUSSEN:  -- we'd know that for sure.

7            THE COURT:  I don't mean to interrupt, sorry.

8    I don't get the sense that everybody agrees on much of

9    anything in this case.

10           MR. RASMUSSEN:  Well, I think -- I'll let them

11   speak for themselves.

12           THE COURT:  Right.

13           MR. RASMUSSEN:  But I was thinking we had

14   agreement on that point.  This is Todd Murray's left hand

15   and we have the same exact thing.  This is, as I

16   understand is, what they would claim is the hand that was

17   -- pulled the trigger.

18           THE COURT:  This would be the right hand.

19           MR. RASMUSSEN:  This is his left hand.

20           THE COURT:  His left hand?

21           MR. RASMUSSEN:  Right.

22           THE COURT:  Do they agree that -- yes or no?

23           MR. RASMUSSEN:  Well, that is something that I

24   don't think they necessarily agree to.  But that what we

25   have theoretically is him reaching around, as you know,

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    and shooting himself across --

2              THE COURT:  There was a crossover, right?

3              MR. RASMUSSEN:  Yeah.  But going --

4              THE COURT:  Potentially.

5              MR. RASMUSSEN:  -- then going back to front, so

6    he was quite a ways around.  Because his left hand

7    doesn't appear to have blood on it.

8              THE COURT:  So do we know if he had long arms?

9              MR. RASMUSSEN:  We know he doesn't have long

10   arms.  He's a -- no, he doesn't.  But that was one of the

11   things that I think we would -- one of the things I

12   didn't see in the expert reports that I think probably

13   could have been there is that, yeah, I think it was

14   probably physically impossible for him to have reached

15   around.  But I don't -- I didn't see that in any of the

16   expert reports that I've seen so far.

17             THE COURT:  Yeah, but unless we have agreement

18   that it was the -- not the left hand, but the right hand

19   that everybody would agree to --

20             MR. RASMUSSEN:  Right.

21             THE COURT:  -- then we've got a difference here

22   as well.

23             MR. RASMUSSEN:  Right.  So this is one of the

24   pieces of evidence that isn't necessarily dispositive.  I

25   think the gun itself -- forensic testing of the gun would

EXHIBIT A

Debra Jones, et al. v. USA                                      4/12/2018

1    have been -- the guns -- would have been dispositive.

2    But this wouldn't be dispositive because there is that

3    disagreement.  And so -- but it certainly doesn't seem to

4    be consistent with Officer Norton's view.

5            THE COURT:  So the one thing that we seem to

6    have agreement on is the shot entered sort of behind the

7    left ear.  Is that correct?

8            MR. RASMUSSEN:  Right, right, yeah, and exited

9    through the other side going a little bit forward.

10           The other two pictures that I wanted to show --

11   and I'll just briefly do the third one because I just

12   wanted to do it to get -- so we get a sense of the scene.

13   But this is Todd Murray lying there after he's been shot.

14   And this is the broader scene.  And this is more

15   subjective, but the -- I think, in some ways, more

16   haunting -- that we have these police officers standing

17   there while he's bleeding to death and no one is talking

18   to him, no one is giving him comfort.  They said that --

19   the officer standing closest in the white shirt said he

20   was told to stand where he was because there was a bullet

21   casing.

22           THE COURT:  I mean, this has got to be very

23   hard for the family sitting here listening to this and

24   looking at these pictures.  I suggest you -- when you're

25   finished with them, you take them off.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1           MR. RASMUSSEN:  Yes.

2           THE COURT:  Like now would be good.

3           MR. RASMUSSEN:  Okay, okay.

4           THE COURT:  But, once again, there are some

5    equities here.  There are some difficulties here.  It's

6    not an easy thing.

7           MR. RASMUSSEN:  Right.

8           THE COURT:  But we've got a set of legal issues

9    we have to get through, not equity.

10          MR. RASMUSSEN:  Right.

11          THE COURT:  If this were a court of equity, we

12   could figure this one out much more easily, but we can't.

13          MR. RASMUSSEN:  Right, right.  And what we want

14   to -- what we want to do then is talk about what are the

15   legal requirements.  And what we have to have, obviously,

16   is we have to have that the United States had the

17   authority and --

18          THE COURT:  Okay.  And what's the relevance of

19   this picture or why do we need to leave it up there?

20          MR. RASMUSSEN:  Oh, sorry.  I don't need it.

21   That's just my screensaver.

22          THE COURT:  That's your homepage.

23          MR. RASMUSSEN:  Yeah.  I'm done with that

24   actually.  We don't -- what we have to have is elements

25   of foreseeability and then a duty to preserve and then we

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    talk about the scope of what -- what the duty to preserve

2    was and that they didn't preserve.

3            THE COURT:  So is your best piece of evidence

4    in your mind -- I don't want to put words in your mouth

5    by any means, but it's just based on your conversation

6    now.  Is the best piece of evidence from your point of

7    view the gun or what else would you think rises to the

8    level of this default judgment stage that you're arguing

9    or even a decision in your favor on spoliation?

10           MR. RASMUSSEN:  Right.  I think the main ones

11   -- the biggest ones are the two guns, that that evidence

12   would potentially have been dispositive and that the --

13   and it was very basic.  When we're talking about, for

14   instance, blood spatter or things of that nature, that's

15   much more difficult and less of a, oh, this would have

16   definitely shown X, Y or Z, but that it would have helped

17   us to recreate exactly what had happened, where people

18   were, those sort of things.  But when we're talking about

19   the guns, we're talking about one gun that doesn't appear

20   to have blood on it and that if it doesn't, then Officer

21   Norton's story is untrue.  And there's nothing else

22   besides Officer Norton's story.

23           And then the other piece is Officer Norton's

24   gun and, again, or his -- and his clothing as well.

25           THE COURT:  How many chambers were there in

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1     Officer Norton's gun?  Because they say there was an

2     unused chamber.  Do you know?

3           MR. RASMUSSEN:  I do not know.  I know he said

4     it was fired twice that day.

5           THE COURT:  Fired twice and there was an unused

6     one.

7           MR. RASMUSSEN:  I don't know.  For the other

8     gun, there were -- it was -- there were two shell casings

9     and then there was the one stovepipe shell casing.  So,

10    for instance, we have Officer Norton saying Todd Murray

11    shot at Officer Norton once and then turned the gun on

12    himself and, yet, we have three -- essentially three

13    shell casings from that gun.

14          THE COURT:  So is part of your argument the

15    failure to preserve and the failure to test?  Does that

16    get you something automatically in terms of spoliation?

17          MR. RASMUSSEN:  Well, what we have to talk

18    about is whether the evidence that is not here, which

19    creates this difficulty that you've been talking about of

20    how do we try this case, which it is -- like I don't know

21    how we try this case.  But that that evidence that is not

22    here, was it something that was relevant, that it should

23    have been gathered.

24          THE COURT:  Well --

25          MR. RASMUSSEN:  And it was plainly.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1          THE COURT:  But who had the duty to preserve

2    and how do we get through this really three-part law

3    enforcement group that was there?

4          MR. RASMUSSEN:  Mm-hmm.

5          THE COURT:  I mean, you had tribal, you had

6    local, you had FBI.  How do we sort through that?  And

7    maybe some more.

8          MR. RASMUSSEN:  We had BIA law enforcement as

9    well as FBI, right.

10         THE COURT:  BIA, correct.

11         MR. RASMUSSEN:  Yes.  Well, the way we get

12   through it -- and as I think the Court is aware, I was

13   not terribly a fan of the District Court of Utah's

14   decision in many ways, but --

15         THE COURT:  I can imagine.

16         MR. RASMUSSEN:  But it said --

17         THE COURT:  You lost.

18         MR. RASMUSSEN:  -- yes.  And I did not see this

19   as -- I saw this as not a summary judgment case in that

20   Court.  But the Court said, well, I'm not going to apply

21   spoliation sanctions and then there really isn't anything

22   besides this officer's testimony and, you know, no one is

23   going to disbelieve this police officer when he's

24   testifying when there's no significant contrary evidence

25   to rebut his testimony.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555


EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
 1              But what the Court also said is BIA was the law
 2    enforcement authority.  They were the ones who were doing
 3    the investigation.  They were the ones that had the legal
 4    responsibility for the criminal investigation.  And our
 5    review is that spoliation sanctions don't apply solely
 6    because of the criminal investigation, that spoliation
 7    are also a civil issue and that they should apply then --
 8              THE COURT:  But we have the offsite,
 9    off-reservation hospital and various components.
10              MR. RASMUSSEN:  Mm-hmm.
11              THE COURT:  How does that play into it?
12              MR. RASMUSSEN:  Well, we do have some
13    spoliation in those locations.
14              THE COURT:  In the --
15              MR. RASMUSSEN:  I think that is -- and the
16    officers certainly, at that point, also, the FBI has --
17    they're the investigative agency for this homicide.  We
18    definitely have a homicide -- an officer-involved
19    homicide and we have rules for gathering evidence and
20    preserving evidence and they were violated at the --
21              THE COURT:  Well, you just said to me -- and I
22    guess help me out here --
23              MR. RASMUSSEN:  Right.
24              THE COURT:  -- because you just said to me BIA
25    had the responsibility, now you're saying the FBI had the
```

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    responsibility.

2              MR. RASMUSSEN:  Oh, I'm sorry, I did not mean

3    to say BIA.

4              THE COURT:  Okay.

5              MR. RASMUSSEN:  The FBI had the responsibility

6    for the criminal investigation of this officer-involved

7    homicide.  That that's not something -- although the

8    United States, in its brief at one point, actually

9    disputes that.  It is something that we have in the joint

10   stipulations that the United States had that

11   responsibility.  And it's from that investigative

12   responsibility, the District Court said that that also

13   then -- they're the ones that had all the responsibility

14   for spoliation.  But they certainly had the investigative

15   responsibility for this crime.  They were notified of the

16   events as the chase was going on.  Before there was --

17   the car was stopped, the FBI was involved.  They arrive

18   at the scene later, but they're monitoring it prior to

19   that.

20             THE COURT:  They weren't there.

21             MR. RASMUSSEN:  What?

22             THE COURT:  But they weren't there.

23             MR. RASMUSSEN:  They weren't there, but they

24   had -- at the point where there is -- a homicide has

25   occurred, then it is within their jurisdiction and they

EXHIBIT A

Debra Jones, et al. v. USA                                4/12/2018

1    have that responsibility.  So my view is that we start

2    from the point where the homicide occurred, that they

3    certainly have the responsibility from that point.

4    There's an argument to be made that they had it from

5    before that, but we don't even need to deal with that.

6    They certainly had it by the time that the shots are

7    being fired.  They then have the investigative

8    responsibility, the duty to preserve the evidence and

9    they --

10          THE COURT:  Even before they get to the site?

11          MR. RASMUSSEN:  Yes.  Because they're -- again,

12   they're on -- they're communicating with dispatch about

13   this ongoing matter.  They don't get to the site --

14          THE COURT:  But they don't have eyes on the

15   site at that point.

16          MR. RASMUSSEN:  They don't have eyes on the

17   site at that point, but they do have the investigative

18   responsibility for it, yes.  But what we're talking;

19   about -- and so in that interim, what we have potentially

20   as evidence is there is some spoliation where the

21   officer, Officer Norton, is allowed to go back to his

22   vehicle to do other things, go through the crime scene,

23   some of those sort of things.

24          But even if we say that they don't have a

25   responsibility until they get to the scene, the real --

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    the most crucial evidence and the biggest spoliations

2    were those with the guns that we talked about and not

3    preserving the clothing and having it tested.  And those

4    all were things that were clearly after they got there.

5    So perhaps we don't even need to deal with that issue of

6    whether they had the responsibility for that half-hour

7    before, approximately half-hour before because they

8    certainly have it for those key pieces of evidence and

9    then the evidence later as we go along at the mortuary,

10   at the hospital, that the United States has the

11   responsibility for that as the investigative agency.

12           The -- one of the things the United States

13   says, the litigation was not reasonably foreseeable, and

14   I wanted to note that the Court -- the Circuit Court has

15   said, you know, we really can't define it much more than

16   that, not reasonably -- whether it was reasonably

17   foreseeable, of course, is a relatively vague standard.

18   It is a multifactor test.  We look at everything that was

19   going on.  We look at all the facts.  The District Court

20   did that, and this is one of the areas where there isn't

21   anything different than what the District Court saw.  The

22   District Court heard Officer Ashdown testify that, oh, I

23   -- yeah, I didn't realize there would be litigation.  And

24   the District Court didn't find that very persuasive and

25   rejected it.  Said, no, litigation was reasonably

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

 1    foreseeable.

 2            We have an officer-involved homicide.  The

 3    United States has the duty to investigate and to charge

 4    if there's wrongdoing.  There are a number of potential

 5    crimes that they could have investigated besides just the

 6    homicide itself and that -- if they didn't -- if they

 7    weren't going to charge anybody, of course there's going

 8    to be litigation on the civil side in this matter.  The

 9    District Court cites to the long history of the

10    litigation between the tribe and the state and the state

11    officers going onto the reservation, violating the

12    tribe's sovereignty, violating the integrity of the

13    reservation.

14            The U.S. was well aware of that history and it

15    is, of course, the tribe's trustee and its police force.

16    So it had the ability to foresee that, of course, there's

17    either going to be a criminal case here or there's going

18    to be civil litigation.  That's what the District Court

19    was looking at and looking at those factors and said,

20    yes, this is foreseeable because there's going to be

21    litigation here one way or the other.  And that then

22    kicks in the duty to preserve the evidence.

23            We would also note that although the United

24    States is saying, well, we saw stuff and we thought, oh,

25    this was a suicide, they did gather some evidence.  It's

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    not that they didn't gather evidence; it's that they
2    didn't gather the evidence that was going to be helpful
3    to Mr. Murray.  It appears that they didn't really
4    believe Officer Norton and chose not to gather the
5    evidence that would have proven it one way or the other,
6    but they did gather some evidence.  They gathered the
7    evidence to show where Officer Norton said he found his
8    bullet casings.  They gathered evidence in a number of
9    pictures, but what they did gather was just the basic key
10   evidence that would have proven or disproven the
11   officer's story.  So they seem to have a keen sense that,
12   yes, litigation was coming, but they didn't gather the
13   evidence that we really needed in this case, and it's
14   those pieces of evidence.
15        Then when we look at what the remedy should be
16   -- and I agree, when I look through our brief and the
17   United States' brief and look through the facts here, I
18   think it is very difficult to figure out what to do
19   because we're talking about that the remedy has to
20   remediate the spoliation and the spoliation here is these
21   pieces of evidence that would have told us one way or the
22   other -- very likely told us one way or the other that --
23   that certainly if the United States had forensically
24   tested the gun -- guns, it would be saying, look, here's
25   really solid evidence that this is how the events

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1   occurred, that Officer Norton's gun has blood on it, that

2   means he did this; that this gun has blood on it means a

3   different story.  They would be telling us all of that --

4           THE COURT:  Are you suggesting that Officer

5   Norton's gun would have had blood on it?  I'm not sure

6   what I'm hearing you say.

7           MR. RASMUSSEN:  I'm saying if they tested it

8   and it did have blood on it, that would definitively

9   prove that Officer Norton did the shooting, yes.

10          THE COURT:  Why is that likely?  We he close

11  enough for that to have even happened to this body?

12          MR. RASMUSSEN:  Well, he says he was not.

13          THE COURT:  Right.

14          MR. RASMUSSEN:  And so if he -- if there was --

15  he was -- his testimony is he was far -- halfway up that

16  hill.  In fact, I think that picture is taken from his

17  perspective.

18          THE COURT:  But even if he wasn't halfway up

19  the hill, let's say he was closer, how frequent is it for

20  a gun of a shooting officer or of anybody -- a shooting

21  person --

22          MR. RASMUSSEN:  Right.

23          THE COURT:  -- to have blood on it if the body

24  is even not right on top of them?

25          MR. RASMUSSEN:  Right, that's my point is that

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    one of these two guns, unless there's other guns out

2    there they've just -- that the scene has been more

3    contaminated than we --

4           THE COURT:  Well, we don't have any indication

5    of that, do we?

6           MR. RASMUSSEN:  Right, right, no, we don't.  So

7    we have two guns.  One of those guns should have blood on

8    it and we don't know which one.  We have a picture of the

9    one gun that doesn't seem to show it.  We don't have any

10   testing of either gun, though.  One of those guns should

11   have blood on it.  If Officer Norton's gun had blood on

12   it, that would show not only that he was -- his whole

13   story was false, but --

14          THE COURT:  Yeah, but that's really --

15          MR. RASMUSSEN:  -- that he was up close to Mr.

16   Murray.

17          THE COURT:  But that's hypothesizing rather

18   deeply, isn't it, that last point of yours on Officer

19   Norton's gun?

20          MR. RASMUSSEN:  What it's saying is that the

21   basic test for these things would be to have tested those

22   guns forensically to see if they have blood on them.

23          THE COURT:  You're just saying it would have

24   been better procedure to have both guns tested.  But we

25   have no reason to think that Officer Norton was right on

EXHIBIT A

Debra Jones, et al. v. USA                                   4/12/2018

1    top of him, do we?

2              MR. RASMUSSEN:  Yes.

3              THE COURT:  Right on top of him?

4              MR. RASMUSSEN:  Yes.

5              THE COURT:  Why?

6              MR. RASMUSSEN:  Because that is the only story

7    that fits with what little evidence we have that is

8    gathered.

9              THE COURT:  Okay.  Explain that.

10             MR. RASMUSSEN:  What we have is we have a gun

11   that Officer Norton says shot Todd Murray and that was

12   not the weapon that shot Todd Murray.  It does not appear

13   to have the blood on it that it would have.

14             THE COURT:  And there are no ballistic studies?

15             MR. RASMUSSEN:  There are no ballistics on the

16   guns.  One of the smaller pieces of evidence that was

17   spoliated was with regard to the autopsy that we don't

18   have sufficient data to try to determine whether there

19   was any trace elements that we could then trace back to

20   shell casings, for example.  We don't have the bullets

21   themselves.  There was no effort to find the bullets

22   themselves.  And so we don't have anything other than

23   these guns.

24             But one of those two guns -- there's only two

25   there -- one of those two guns has to have blood on it.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1   The basic thing would be to say, let's test these two
2   guns and see which one has that.
3          THE COURT:  I'm not following that.  I
4   understand the one, but I don't understand why you say
5   that the officer's gun would necessarily have to have
6   blood on it.
7          MR. RASMUSSEN:  No, I'm saying if it -- no, it
8   wouldn't necessarily.  If it did have blood on it, that
9   would be dispositive proof that Officer Norton did the
10   killing.  It would be dispositive.  One of those two guns
11   would have it.  That would be dispositive proof.  If
12   Officer Norton's clothing had any of Todd Murray's blood
13   on it, that would be dispositive proof.
14          Yes, we believe that Officer Norton was right
15   up against Todd Murray.
16          THE COURT:  And what's your basis for that?
17          MR. RASMUSSEN:  That the gun that they're
18   saying was used to shoot Todd Murray was not the gun that
19   shot him.
20          THE COURT:  I understand.  But what's your
21   basis for saying that he was right up against him?
22          MR. RASMUSSEN:  There's no one else -- again,
23   we don't --
24          THE COURT:  You don't have any real information
25   that says they were close up against each other.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

 1          MR. RASMUSSEN:  What we have is -- the evidence
 2    that we do have doesn't support the --
 3          THE COURT:  I understand there are gaps.  But
 4    you don't have anything positive that suggests they were
 5    close together or do you?
 6          MR. RASMUSSEN:  No.  What we have is the
 7    shooting was at close range.  Whoever shot him was there,
 8    right up by him, put the gun to his head and pulled the
 9    trigger.  That's what we have.  And we have this one gun
10    that does not appear to be the weapon.  We only have two
11    people there; we only have two guns there.
12          THE COURT:  And I understand that it would be
13    very difficult for the family to think that a member of
14    their family shot himself.  I get that.
15          MR. RASMUSSEN:  Right.
16          THE COURT:  But I'm trying to figure out what
17    it is that you think places Officer Norton in closer
18    proximity to the victim.
19          MR. RASMUSSEN:  Than he says?  We don't believe
20    a word of what he says.  That's essentially it.  But the
21    reason that we -- also the reason that we don't is that
22    what little physical evidence was gathered does not
23    appear to be consistent with his story.
24          THE COURT:  All right.  Let me ask you a couple
25    questions about the legal arguments here.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                      4/12/2018

1           MR. RASMUSSEN:   Mm-hmm.

2           THE COURT:   So is there a requirement for bad

3    faith?  Is it only for dispositive sanctions, or if we

4    found lesser sanctions, is bad faith by the Government

5    still a requirement or does negligence suffice in lesser

6    sanctions?

7           MR. RASMUSSEN:   Certainly, negligence suffices

8    for lesser sanctions.  As to whether it is required for

9    dispositive sanctions, generally, I would say generally

10   it is, but still the goal of sanctions is to put the

11   parties back where they should be if the evidence hadn't

12   been spoliated.  So, you know, we get to --

13          THE COURT:   So do you need bad faith or not?

14          MR. RASMUSSEN:   So our review is that because

15   the sanctions that are necessary because of the failure

16   to gather the dispositive evidence is -- really results

17   in a default judgment that we don't need it.  Again, I

18   think the alternative would be we could have people do

19   whatever they could reconstruct based upon let's assume

20   this gun doesn't have blood on it and then go from there.

21   We could do that.

22          But I think -- as I viewed it and I -- the

23   United States can make their response -- as I viewed it,

24   that wasn't the direction they would go.  If it's like

25   this gun doesn't have blood on it, that's not the murder

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    weapon.  But if they want to dispute that, yeah, I think
2    we can say, let's assume that gun doesn't have blood on
3    it because it doesn't appear to and you didn't do the
4    forensic testing, the basic forensic testing.
5           Now, let's go from there with that assumption
6    and let's see what the experts say.  I think they would
7    come back, but we can deal with that later.
8           THE COURT:  So you suggested that the FBI
9    should have had control of the evidence from the point
10   that they were on the radio dispatch --
11          MR. RASMUSSEN:  Mm-hmm.
12          THE COURT:  -- forward.
13          MR. RASMUSSEN:  Mm-hmm.
14          THE COURT:  I'm not sure how I evaluate the
15   point at which the United States, either through the FBI
16   or whatever, had control of the evidence, of the parts
17   that were there when they got there and parts that
18   potentially were spoliated before they got there.  How do
19   I determine that?
20          MR. RASMUSSEN:  I think what we have to do is
21   we have to say what is a -- what is the reasonable
22   procedure at that point and --
23          THE COURT:  Is it reasonable or is it standard
24   procedure or what is it?  In other words, if they have an
25   operational way of doing their cases, is that what we

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    should use, standard operating procedure kind of thing,

2    or what -- what should the test be of that?

3            MR. RASMUSSEN:  Well, there certainly is case

4    law that says, you know, if this is the evidence you're

5    supposed to gather or this is what you're supposed to

6    keep, these are the records you're supposed to keep and

7    you don't have that, that we apply spoliation.

8            THE COURT:  This is a little bit different,

9    though.

10           MR. RASMUSSEN:  Right.

11           THE COURT:  I mean, this is -- this is -- you

12   know, normally in the situations that you're going to

13   read out in the standard cases, it's going to be officer

14   at the scene, officer secures the scene, officer secures

15   the -- you know, secures and bags the things and takes

16   them and puts them into the locker, signs them in, signs

17   them out if they were going to go out.  A lot of things

18   happened here that were a little bit different.  But can

19   you make the U.S. responsible for that before they ever

20   got there.  This is the hard one in this case.

21           MR. RASMUSSEN:  I think this is the hard one in

22   this case is that -- and I think that's a relatively

23   small amount of evidence that potentially was going to be

24   very significant.  But I don't think, for example,

25   Officer Norton, if we assume that when he went up to his

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    car, he was -- what he was doing was cleaning off his

2    hands of the blood, that even if we had done forensic

3    testing of that blood, I don't think it would have been

4    sufficient that it would have completely eliminated all

5    the blood from his clothing or from his hands.

6              So, you know, what we -- there was evidence

7    that was spoliated before the FBI got on the scene.  That

8    I -- that part -- and, again, I think it's less than half

9    an hour, but that period of time is the difficult one, I

10   think.  After that point in time, after they get on the

11   scene, that's where we end up with the guns --

12             THE COURT:  Well, that's the easier part.

13             MR. RASMUSSEN:  Yeah, I think so, right.

14             THE COURT:  That's easier to figure out.

15             MR. RASMUSSEN:  But that first part, our view

16   is that we are -- we're talking about do they have a duty

17   at that point.  Yes, they have the duty at that point.

18   They have the responsibility for that investigation.

19             THE COURT:  Sure, I understand what you're

20   saying.  Let me ask you a different question.

21             MR. RASMUSSEN:  Okay.

22             THE COURT:  You know, burdens of proof kind of

23   looks like a little tennis match sometimes.  It goes back

24   and forth.  Where do see the burden of proof?  Does it

25   shift here?  You've got the burden at some point to prove

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    spoliation.

2              MR. RASMUSSEN:   Mm-hmm.

3              THE COURT:   Is there a point at which it

4    shifts?

5              MR. RASMUSSEN:   I don't recall -- I don't

6    recall any of the cases ever talking about the burden

7    shifting.   They do talk about that -- oh, gosh.   I think

8    they use slightly different terms to kind of refer to

9    that, though, that, you know, when we're dealing with

10   something that was supposed to be collected that -- and

11   we know that, that that then -- the other side has to

12   come forward with a reason for -- you know, an

13   explanation essentially.   But I don't recall any of the

14   cases talking about a shifting -- an actual shifting of

15   the burden.

16             THE COURT:   So assuming, as you may have

17   gathered, I'm not there for a default judgment at this

18   point.

19             MR. RASMUSSEN:   Right.

20             THE COURT:   What are the specific sanctions

21   you're seeking?

22             MR. RASMUSSEN:   Well, I think the most

23   important thing is that --

24             THE COURT:   And what inferences are you seeking

25   to get out of that?

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1          MR. RASMUSSEN:  What's that?

2          THE COURT:  And what inferences are you seeking

3    to get out of that?

4          MR. RASMUSSEN:  Right, right.  I think the most

5    important thing is that with the -- you know, we have the

6    one gun that they say Todd Murray shot himself with.  But

7    -- and they clearly have that gun, had control of that

8    gun, that we -- the Court should say we have to assume,

9    based upon the picture and because there is no forensic

10   testing of that gun, that we have to assume that that gun

11   does not have his blood or tissue on it, does not have

12   his fingerprints on it.  I think that's what we would

13   have to do.

14         THE COURT:  So you're -- in every way, what

15   you're really doing here is when you say that the effect

16   of the sanctions should be -- and I'm quoting for you --

17   that the bad man for whom the United States has a

18   responsibility killed Mr. Murray, and that's essentially

19   a default judgment.  Right?

20         MR. RASMUSSEN:  Well, that's one of the

21   things that I -- I think -- and that's why I think the

22   default judgment is, in effect, the remedy here is

23   because that -- I don't think there is any other

24   plausible story or way of dealing with this case if that

25   gun does not have his blood on it.  There's -- Norton is

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                          4/12/2018

1    the sole witness and his sole story is that that was the

2    gun that shot Todd Murray, and it wasn't.

3            THE COURT:  So let me put it in the context of

4    a typical trial.  When sanctions for spoliation are

5    sought, it's generally to knock out the credibility of a

6    particular witness --

7            MR. RASMUSSEN:  Mm-hmm.

8            THE COURT:  -- or an inference that certain

9    documents would have said what they would have said, so

10   to speak, if they hadn't been destroyed.  It's generally

11   not for a total judgment.

12           MR. RASMUSSEN:  Right.

13           THE COURT:  Is what you're asking that the

14   testimony of a particular witness, as best as we could

15   construct it, whether from the depositions or from

16   something else, be not found credible and would that be

17   Norton or is it something else?  What I -- the trouble

18   I'm having with your filing is -- and, I mean, you

19   actually will have a chance to be more specific in

20   supplemental filings.

21           MR. RASMUSSEN:  Okay.

22           THE COURT:  But the trouble I'm having is if we

23   don't go the default judgment route, which I'm

24   disinclined to do --

25           MR. RASMUSSEN:  Mm-hmm.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1          THE COURT:  -- although I could change my mind,
2   but, you know, what do we do with it?  Do we restrict the
3   results of spoliation and sanction to a particular part
4   of the case, to something else?  How do we navigate this?
5          MR. RASMUSSEN:  Well, again, the purpose is
6   primarily to impose a remedy that but for that
7   spoliation, this is where we would be.  And in this case,
8   the evidence that was spoliated was was there blood or
9   tissue on the gun.
10          THE COURT:  No, I understand.
11          MR. RASMUSSEN:  What -- we don't have much
12   other than -- that we can do to remedy that other than
13   saying let's assume --
14          THE COURT:  So is one thing the inevitability
15   of a trial -- that's kind of where it was headed.  Is it
16   the inevitability of a trial which shifts that burden
17   that we talked about earlier to the Government to show
18   that whatever happened here in terms of spoliation did
19   not prejudice the case as a whole or why it was not
20   default-judgment-worthy basically?
21          MR. RASMUSSEN:  Um...
22          THE COURT:  That's part of the reason why I ask
23   about the inevitability of a trial.
24          MR. RASMUSSEN:  Right.  I don't see that as a
25   sufficient remedy because, again, I think what we're

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    looking at is evidence that would have been dispositive

2    that was not gathered, basic evidence that would have

3    been dispositive.

4              THE COURT:  But wouldn't the Government have

5    the right to at least prove the absence of the prejudice

6    to their case?

7              MR. RASMUSSEN:  Yes, no, I think they -- I

8    think they would.  I don't see --

9              THE COURT:  So we're going to trial.

10             MR. RASMUSSEN:  Well, I --

11             THE COURT:  A long, drawn-out trial,

12   unfortunately.  I mean, we'll do it as quickly as we can,

13   but, you know, it does mean gathering evidence that's --

14   you know, that's out there that -- we can't use the

15   District Court decision.

16             MR. RASMUSSEN:  Right.

17             THE COURT:  It's a very odd position.  I've

18   never been in this position before, but --

19             MR. RASMUSSEN:  Me either, Your Honor.

20             THE COURT:  I'm sure you haven't either, I'm

21   sure.

22             MR. RASMUSSEN:  Yes.

23             THE COURT:  But that's what both makes it

24   interesting and difficult.

25             MR. RASMUSSEN:  Yeah.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
1              THE COURT:  But interesting is not generally
2     good --
3              MR. RASMUSSEN:  No.
4              THE COURT:  -- because it means cost, it means
5     time, it means testimony, it means travel.  It means all
6     kinds of things.  And the other thing I want you to think
7     about -- and I don't think you need to answer right now
8     necessarily, but you can if you want to, is in order to
9     figure out spoliation particularly of the gun and maybe
10    some of the other items, do we need the expert testimony
11    now?  It's the angle issue.  It's the but-for issue that
12    you raised with blood.
13             MR. RASMUSSEN:  Right.  I guess -- I mean, I
14    was thinking we didn't need that, but that might be
15    actually to say, yes, would -- if this gun doesn't have
16    blood on it, what does that mean to have the experts
17    opine on that.  Would that be possible, if this were the
18    murder weapon, to have the experts opine on that?
19             THE COURT:  Yes.  Because where I find myself,
20    frankly, is guessing and I don't -- I'm not in the
21    business of guessing.  Courts don't guess.
22             MR. RASMUSSEN:  Right.
23             THE COURT:  And so do I need this -- some
24    expert testimony on all of these items that are
25    significant?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1           MR. RASMUSSEN:  I think that would certainly
2   help the Court.
3           THE COURT:  Well, that's what this is about.
4           MR. RASMUSSEN:  Yes, yes.
5           THE COURT:  I have to issue a decision.
6           MR. RASMUSSEN:  I'm pretty sure what -- I'm
7   pretty sure what those come back as.  But, yes, I think
8   the Court is struggling with issues there.  I think
9   there's not much of a question about if this gun doesn't
10  have blood on it, Norton's story is a lie.
11          THE COURT:  But I don't have any basis, except
12  hearing you testify, which you can't do because you're
13  not a testifying witness.
14          MR. RASMUSSEN:  Right.
15          THE COURT:  You're the lawyer who gets to
16  summarize testifying witnesses.
17          MR. RASMUSSEN:  Right.
18          THE COURT:  But I need a testifying witness.
19          MR. RASMUSSEN:  No, I was summarizing what we
20  had from the doctor who said that the blood and -- the
21  gun and the hand would have been covered in blood.
22          THE COURT:  Right.
23          MR. RASMUSSEN:  The gun and the hand that
24  killed him would have been covered in blood.  That's
25  where I got that part of it.  But, yeah, I think we could

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    do experts to go more specifically into that, whether

2    there's any way that it could be otherwise.

3              THE COURT:  Anything else that I need to hear

4    or are we ready to turn to the Defendant?

5              MR. RASMUSSEN:  Well, I just wanted to briefly

6    -- because the Court did raise it a bit ago about the --

7    whether when we're talking about -- I think the

8    Government has an argument that when we're talking about

9    the remedy against them, that it has to be bad faith.

10   And what they're citing -- all the cases they're citing

11   are criminal cases under the due process clause.  They

12   are not spoliation cases.

13             In fact, they cite one 10th Circuit case that

14   makes that distinction and says, here we're dealing with

15   the due process issue and then they say -- the Defendant

16   also raises on appeal, for the first time, a civil

17   sanctions issue.  But, for instance, if we're dealing --

18   the Supreme Court case that they cite to the Court is a

19   case where the United States Supreme Court is reviewing a

20   case from Arizona, from the state courts, and so it has

21   to be dealing with a constitutional issue and is saying,

22   there's not a due process constitutional issue.

23             Spoliation sanctions are not a constitutional

24   issue.  As we discuss in our briefs, they are -- the

25   purpose of them is civil and is to remedy the problem.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    And so those cases don't apply here.  None of those cases

2    apply here.

3            THE COURT:  So if we were to do a hearing on

4    experts, I assume we could do that now, but that would

5    not -- not today, but, I mean, we could do that first.

6            MR. RASMUSSEN:  Right.

7            THE COURT:  And that still would not preclude

8    the need for a trial at the end of it.  So what you're

9    talking about is long and gory.

10           MR. RASMUSSEN:  Yes, I heard the Court very

11   clearly on that and we'll be talking to the United States

12   after the hearing about that.

13           THE COURT:  I think you're going to have to

14   because this doesn't make sense for anybody, frankly, in

15   my mind.  I mean, I'm happy to do it.  I'm here on

16   permanent retainer.  So is the Government.

17           MR. RASMUSSEN:  Right.

18           THE COURT:  But -- which is one of the problems

19   often in litigation.  But, you know, I like trials.  I

20   don't get enough of them, as you know.  Only about 5

21   percent of cases, if that, maybe 2 percent, go to trial

22   in Federal Court.  So I'd be happy to do that and it

23   takes me back into a world that I find fascinating.  So

24   all is good and I'm here to do it.  But whether that

25   makes sense for you is a very different issue.

EXHIBIT A

1          MR. RASMUSSEN:  Yes, it is.

2          THE COURT:  And then, of course, we have the

3    distinct possibility, whoever wins, that the other side

4    would appeal it anyway.  So then you go back up to the

5    Circuit.  It took a year and a half the last time.  We

6    weren't all that speedy ourselves.  But, you know, we

7    take time to do it right, both here and in the Appellate

8    Court, and these are not your usual issues.  So that

9    generally translates into some more thoughtfulness and,

10   therefore, to time.

11         So if you're thinking about, you know, we go

12   through whatever the Trial Court has to go through, then

13   you potentially go through an appellate process again,

14   and Heaven forfend another remand.  I've only had one or

15   two cases in which we've had double remands in the 30

16   years that I've been here, but they are long and they

17   don't necessarily make sense for private plaintiffs

18   particularly.  The corporations, it's kind of part of

19   what they do.

20         But, you know, I think you need to think long

21   and hard about whether you want to talk to the United

22   States, if the United States is willing to talk to you.

23   Although I'll give them the same speech in the sense that

24   this one has some bad precedential potential and, you

25   know, they should want to talk to you as well as you

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

 1    should want to talk to them.  But it's up to you

 2    individually.  I can only make suggestions in that

 3    regard.  I can't force anybody to the table.

 4            I run the ADR program here.  It obviously would

 5    not be me.  But one of the things that, you know, I've

 6    seen in running that is there really are cases in which

 7    it makes more sense than in others and it also makes

 8    absolutely no sense unless both parties are willing to

 9    come to the table and are serious about coming to the

10    table.  And I -- when I conduct the ADRs for some of my

11    colleagues, I am very happy and very willing to call it

12    if they're just coming to the table just to chat with

13    each other, and we go home that same day.

14            But if people are serious about coming to talk,

15    then I think this might be a good situation in which to

16    do it.  I don't know that you need an ADR reference for

17    it.  I think you could do it yourselves.  But that's all,

18    you know, up to you all.

19            MR. RASMUSSEN:  Okay, thank you.

20            THE COURT:  All right.  Mr. Petrie?  So let's

21    start with default judgment and get that out of the way

22    because I think I know what you're going to say.

23            MR. PETRIE:  Good afternoon, Your Honor, Terry

24    Petrie.  You're correct.  The United States does not

25    believe default judgment is appropriate and it's not

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    warranted here for the various reasons that we have
2    arrived at, which include from the get-go that we do not
3    think spoliation has happened on the FBI's watch.
4          What I would suggest, Your Honor, if I may, is
5    to start out with just a brief overview of some of the
6    facts that occurred there.
7          THE COURT:  Oh, I know the facts, honestly,
8    from what we've got.
9          MR. PETRIE:  Yes.
10         THE COURT:  We've got some documents.  We've
11   got a trial court in Colorado.  We've got the recitation
12   of facts that I wrote for the decision I wrote.
13         MR. PETRIE:  Your own decision.
14         THE COURT:  A brief summary of that.  So I
15   don't think we need to do it.  What I want to focus on --
16         MR. PETRIE:  Yes.
17         THE COURT:  -- is the item -- I don't need the
18   sort of general overview.  What I want to focus on is --
19   and I'm sorry if I'm cutting off something that you
20   prepared carefully and want desperately to deliver, but
21   we're going to move on to what we're hearing you talk
22   about.  There's been a request for spoliation sanctions,
23   and even if we don't get a default judgment, the
24   inference is some of which could immediately trigger the
25   bad man statute.  There are not quite a dozen of those

EXHIBIT A

Debra Jones, et al. v. USA                                          4/12/2018

1   items and that's what I think you need to focus on and

2   tell me why -- and let's start with the guns since that

3   seems to be the one that the Plaintiff feels is the most

4   important.

5            MR. PETRIE:  Your Honor, if I may, the way I

6   view it is that when we consider the requirements that

7   the Federal Circuit imposed in the Jandreau case --

8   that's what we're measuring the facts against to

9   determine whether or not sanctions are appropriate here.

10           THE COURT:  And that's what?

11           MR. PETRIE:  And those three requirements are

12  first that the -- in this case, the Plaintiffs bear the

13  burden to establish all three of those requirements.  And

14  the first requirement is that they have to be able to

15  show that the spoliator, here the United States, the FBI,

16  that they had the duty to preserve the alleged spoliated

17  evidence as well as had control over that evidence as

18  well.

19           And as Mr. Rasmussen mentioned in passing, and

20  he's correct, that duty to preserve the evidence, the

21  allegedly spoliated evidence, is triggered once it is

22  reasonably foreseeable that litigation would ensue.

23           THE COURT:  Okay.  Any criminal case,

24  obviously, that triggers pretty much, doesn't it?

25           MR. PETRIE:  No, it does not, Your Honor.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1            THE COURT:  Really?

2            MR. PETRIE:  That's correct, Your Honor.  It

3    does not.  Because the FBI, in this case Special Agent

4    Ashdown, a gentleman who was within two months of his

5    retirement, so he had been an FBI agent for a long time,

6    he arrived at the scene and he did what he was supposed

7    to do, which was to evaluate the evidence at the scene.

8            THE COURT:  So are you telling me there was no

9    duty to preserve at the scene?

10           MR. PETRIE:  That's --

11           THE COURT:  Not on individual items, but

12   generically?

13           MR. PETRIE:  The -- if there is an obligation,

14   it's triggered by what he is evaluating to determine

15   whether or not there is --

16           THE COURT:  That's the only question.  Do you

17   believe in this case that there was no duty to preserve

18   any of the evidence even though a murder had occurred or

19   a very, very serious injury had occurred?

20           MR. PETRIE:  For spoliation purposes, that is

21   correct, I do not.  Now, he's got an obligation to --

22           THE COURT:  So when and if --

23           MR. PETRIE:  -- conduct his investigation.

24           THE COURT:  -- when and if did the duty to

25   preserve trigger in this case or not at all?  What are

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    you saying?

2              MR. PETRIE:  I'm saying that for spoliation

3    purposes, that obligation was not triggered here because

4    the --

5              THE COURT:  Here at what point?  The whole

6    time?  The whole case?

7              MR. PETRIE:  The entire time, that's correct,

8    Your Honor.  If it did, it would have been when the

9    Plaintiffs brought suit against the United States.  Well,

10   actually, it would have been back in March of 2012,

11   somewhere in there, where the Plaintiff --

12             THE COURT:  What are you telling me --

13             MR. PETRIE:  -- served notice on the United

14   States that they had claims to include a wrongful death.

15   But before that, the chronology shows that the FBI there

16   in Utah had no indication that the Plaintiffs had served

17   notice to the State of Utah and other local government

18   agencies of their intent to file claims and ultimately

19   sue, starting initially in the state court.

20             THE COURT:  So at a criminal scene or

21   potentially criminal scene, there's no duty to preserve

22   or to investigate or -- nothing triggers because in this

23   case you get to wait until a civil suit is filed?

24             MR. PETRIE:  No, I'm talking specifically in

25   the context of spoliation, which is the issue here before

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    the Court.  And, Your Honor --

2              THE COURT:  I understand the spoliation issue.

3    But I'm just asking you whether there was a duty at any

4    point to --

5              MR. PETRIE:  The duty --

6              THE COURT:  Don't interrupt me, please.

7              MR. PETRIE:  Yes, Your Honor.

8              THE COURT:  Was there a duty at any point to

9    preserve the evidence in this shooting case?

10             MR. PETRIE:  And to the extent that duty

11   exists, it would have been a function of the protocols

12   and the standards employed by the FBI when they

13   investigate the scene of an incident.  And what we have

14   here --

15             THE COURT:  Okay, stop for a moment because I

16   can't follow you that fast.

17             MR. PETRIE:  Sure.

18             THE COURT:  Was there any information

19   introduced at the District Court or do we have

20   information of at the time of this particular shooting,

21   what the protocols were?

22             MR. PETRIE:  I have not been able to obtain

23   information about the protocols.  What I did, though,

24   Your Honor, was I took a look at the FBI's edition of the

25   Manual for Investigations and Operations Guidance at that

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1   point in time.  And it indicated there -- and we cite it

2   in our brief, that the investigator is to arrive and take

3   a look and evaluate what they have there and that that

4   gentleman determined, based upon the information that he

5   was receiving, and then personally looked at that what he

6   was looking at was a case where Mr. Murray had shot

7   himself.  So at that point, that then -- that's what

8   governed his activities there on the scene in

9   investigating it.

10          THE COURT:  Is that what the FBI would do

11   today?

12          MR. PETRIE:  Your Honor, I can't speak to what

13   the FBI would do today.

14          THE COURT:  I just find it incredulous,

15   frankly, that in a shooting case, there wouldn't be some

16   concern for the evidence at the scene.  I just don't -- I

17   can't understand it.

18          MR. PETRIE:  Well, Your Honor, they did -- they

19   did have that.  But, remember, please that the evidence

20   that they are going to preserve is a function of what

21   they observed there at the scene and what they had was

22   the fact that the shooter or, rather, Mr. Murray and

23   Detective Norton were nowhere close to each other.  And

24   it's not just Detective Norton's word, but as is

25   evidenced in the District Court decision, that there is

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    testimony that two other deputies, belonging to different

2    police agencies within the State of Utah, observed Mr.

3    Norton, as well as Mr. Murray, and that they were at

4    least 100 yards apart and that not only Detective Norton,

5    but also Mr. Anthoney Byron, one of the other law

6    enforcement officials there on the scene, observed Mr.

7    Murray fall to the ground and that there was no one there

8    in the vicinity of Mr. Murray.  So it's not just

9    Detective Norton saying that.

10            THE COURT:  I understand that.  That's -- there

11   may be more.

12            MR. PETRIE:  So --

13            THE COURT:  But let me ask you this.

14            MR. PETRIE:  Yes, Your Honor.

15            THE COURT:  Did the FBI not preserve anything

16   at the scene?

17            MR. PETRIE:  Yes, they did.

18            THE COURT:  My understanding is they did

19   preserve some things.

20            MR. PETRIE:  Yes, they did, Your Honor.

21            THE COURT:  So why would they preserve some and

22   not some of the more salient items of potential evidence?

23            MR. PETRIE:  Well, again --

24            THE COURT:  What were they preserving it for

25   then?  I mean, is this a totally incoherent site

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    operation?

2              MR. PETRIE:  No, Your Honor.  I think what you

3    have is the preservation of evidence that relates to

4    their sense of what had happened there, which was that

5    Mr. Murray shot himself because factually they had no

6    evidence to suggest that Mr. Norton --

7              THE COURT:  And they had no duty to figure it

8    out?  They just could conclude from a visual on-the-spot

9    that, oh, my goodness, it's a suicide?  It just doesn't

10   seem to make sense.  I mean, it's a nice retroactive view

11   of this thing, but it makes no sense to me.

12             MR. PETRIE:  Well, I respectfully disagree,

13   Your Honor.

14             THE COURT:  All right.

15             MR. PETRIE:  Because if you are investigating

16   something, you're going to take a look at what does that

17   evidence suggest.  And when you have irrefutable -- and

18   Plaintiffs have not rebutted it -- that the -- Mr. Murray

19   and the detective --

20             THE COURT:  Well, let me suggest to you --

21             MR. PETRIE:  -- are over 100 yards apart.

22             THE COURT:  All right, let me suggest this to

23   you.  That is an argument that I saw in your briefs that

24   made me very, very uncomfortable at the time I read it

25   the first time, that suggests a level of -- and, you

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1  know, again, I'm not committing to how it would come out
2  at the end because I'm obviously going to get deeper than
3  I have to prepare for today because I wanted to hear what
4  you have to say.  I will go back in this particular area
5  with far more questions than I walked into the room with
6  as to how you can make the judgments that you're alleging
7  made so much sense and that there was an automatic, in a
8  shooting case, assumption that this was a suicide.
9       I can't even imagine a current FBI or any other
10  law enforcement agent coming to that conclusion so
11  rapidly at the scene.  It just doesn't make logical
12  sense.  Now, we'll have to take everything we have, which
13  is disjointed information in this case, and try to figure
14  out what happened.  But I can't imagine the FBI feeling
15  very comfortable in today's environment, which doesn't
16  matter, but in any environment, frankly, with that kind
17  of here, we'll do this, we won't do that, we'll do this,
18  we don't do that, it looks good, maybe it's a suicide,
19  sure it's a suicide, and walk away from the scene and
20  take some things.
21       MR. PETRIE:  Your Honor, I --
22       THE COURT:  At the very least, what you're
23  going to get from me in an opinion is --
24       MR. PETRIE:  And I understand your perspective.
25       THE COURT:  -- some comment on that.

EXHIBIT A

Debra Jones, et al. v. USA                              4/12/2018

1          MR. PETRIE:  I understand your perspective,

2     Your Honor.  And, again, respectfully, from my

3     perspective, as I look at what --

4          THE COURT:  Have you ever been in law

5     enforcement?

6          MR. PETRIE:  Not as a law enforcement official,

7     no, I have not, Your Honor.  I spent 20 years in the

8     United States Air Force.  I've been an attorney.  But

9     other than that, I --

10         THE COURT:  I respect your history and your

11    preparation for this job.  That's not what I'm asking.

12    This is -- this just grabs me wrong.

13         MR. PETRIE:  Well, Your Honor, there is, I

14    think, the notion that when one arrives on a scene where

15    something has happened, you -- the investigator will take

16    an approach that responds to what the information is

17    there before them.

18         THE COURT:  Well, maybe --

19         MR. PETRIE:  Now, maybe what that amounts to

20    then -- and I cannot speak, as you've noted, from the

21    vantage point of having law enforcement experience.  The

22    MIOG that I referenced here earlier, it did not spell out

23    specific procedures that are employed there on the ground

24    at an investigation.  And so maybe -- even though I

25    personally believe that this does not require some kind

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
 1    of approach that employs experts because the facts are --
 2    they're there and --
 3              THE COURT:  Well, you both think the facts
 4    prove your case 100 percent.  So that doesn't get me
 5    anywhere.
 6              MR. PETRIE:  Well, Your Honor, the
 7    Plaintiffs --
 8              THE COURT:  You relied -- you relied very
 9    heavily in the papers you submitted on the District Court
10    and 10th Circuit opinions, what the Federal Circuit
11    specifically said we can't do, so --
12              MR. PETRIE:  Yes, Your Honor.
13              THE COURT:  -- I have to get away from that.
14              MR. PETRIE:  Yes, Your Honor.
15              THE COURT:  And I have to get away from your
16    doing that.
17              MR. PETRIE:  And, Your Honor, if I may respond
18    directly to that.  The evidence that is before this Court
19    is directly the evidence that was put before those two
20    courts.  Now, certainly, the Federal Circuit has taken a
21    position about what this Court can do, vis-a-vis, that.
22              THE COURT:  So what are you saying to me by
23    saying that?  And I may not disagree with this part of
24    it.  But I don't think we can rely on it as the District
25    Court and the Appellate Court in Colorado concluded.  Are
```

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    you saying that you have to submit to me all of the

2    evidence on these issues, these 11 or 12 issues that

3    Plaintiff is --

4            MR. PETRIE:  No, I don't think we have to

5    because that evidence is there.

6            THE COURT:  Let me -- can I finish my thought?

7    Can I finish my thought, please?

8            MR. PETRIE:  Certainly, Your Honor.

9            THE COURT:  All of these issues that the

10   Plaintiff has put forth as potentially triggering

11   sanctions, who do -- I can't trust -- for the purposes

12   here, I eminently trust the Federal District Court in

13   Colorado and the Federal 10th Circuit.  They do good

14   work.  But here I'm told that I can't do that.  Normally,

15   we can rely on that issue preclusion basis.  We can't

16   here.  We can't rely on it as law of the case; we can't

17   rely on it as res judicata.  We have to independently

18   look at spoliation issues.

19           So is the other alternate here having to take

20   whatever evidence was submitted to the District Court in

21   the factual issues, not the Circuit but to the District

22   Court to get the evidence that was submitted, which is as

23   close to contemporaneous as we're going to get and

24   anything else that there may be out there?  I know that

25   we have some depositions in the earlier part of what we

EXHIBIT A

1    did here, but I don't think it's all of the material that

2    you're talking about.  Do we have to look at that afresh

3    and brief it and go through it?

4            MR. PETRIE:  Your Honor, as I see it, if Your

5    Honor is going to reach a decision on whether or not

6    spoliation has happened and whether sanctions are

7    appropriate, and if so, why, then the Court has to look

8    at what is the evidence, what happened.  And that's

9    either going to come --

10           THE COURT:  Well, then we have to get all that

11   evidence, right?

12           MR. PETRIE:  That -- well, if we believe --

13           THE COURT:  I can't take your summary; I can't

14   take the Plaintiffs' summary; and I can't take the

15   conclusions of the District Court.

16           MR. PETRIE:  That's correct.  You can't take

17   the conclusions of the District Court, but you can

18   certainly take the evidence that was put before --

19           THE COURT:  I can't take their description -- I

20   can take the evidence -- the original documents and

21   evidence --

22           MR. PETRIE:  And testimony.

23           THE COURT:  -- that was submitted to them.

24           MR. PETRIE:  Yes, Your Honor, I can see that.

25           THE COURT:  But I cannot take their

EXHIBIT A

72

Debra Jones, et al. v. USA                                    4/12/2018

1    conclusions.

2             MR. PETRIE:  Their conclusions.  And agree.

3             THE COURT:  I can't take their factual

4    statement.

5             MR. PETRIE:  Yes, Your Honor.

6             THE COURT:  All right.  So --

7             MR. PETRIE:  Completely agree.

8             THE COURT:  -- do we have to review from de

9    novo essentially factually the circumstances of Mr.

10   Murray's death, whether --

11            MR. PETRIE:  That's certainly my perspective,

12   whether we take the facts and the evidence --

13            THE COURT:  So how in the world do you do that

14   on a motion to dismiss -- another motion to dismiss?

15   You've asked for another motion to dismiss.  Which, by

16   the way, you cannot file until we agree that it's the

17   appropriate time.

18            MR. PETRIE:  Yes.  Yes, Your Honor.

19            THE COURT:  Understand that loud and clear

20   because I'd --

21            MR. PETRIE:  I do.

22            THE COURT:  -- send it back to you in a

23   heartbeat at this point.

24            MR. PETRIE:  I do, Your Honor.  And I'm not

25   here to suggest that we are at a point --

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1          THE COURT:  Well, you did suggest it.

2          MR. PETRIE:  -- where we would ever be filing a

3    motion to dismiss.  That's not my point.  My point,

4    though, is --

5          THE COURT:  That was your point.

6          MR. PETRIE:  My point is that for the facts

7    that you are assessing to determine whether or not

8    spoliation has happened, and if so, what sanctions would

9    be appropriate, that's got to come from, at present, the

10   evidence that is of record.  And to the extent we have

11   that, it's evidence that was put before the District

12   Court.  That's the --

13         THE COURT:  Okay.  And what about the issues

14   that the Plaintiff has raised here today in terms of if

15   there's no blood on the gun, there simply can't be the

16   conclusion that he shot himself?

17         MR. PETRIE:  Your Honor --

18         THE COURT:  And whether or not we need experts

19   or would allow experts for that.

20         MR. PETRIE:  If the Court is going to take an

21   approach where the parties are able to introduce

22   additional evidence, then certainly perhaps the use of

23   experts might be helpful.  Yet, as it presently stands,

24   the evidence that is in the record before the District

25   Court shows that you've got a medical examiner that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    conducted an examination and he determined -- this is
2    evidence, not the Court's conclusion -- the District
3    Court may have reached the same conclusion, but the
4    evidence itself was that you had a medical examiner who
5    examined Mr. Murray's body and he determined that Mr.
6    Murray died from a contact wound and, moreover, that that
7    wound was not the sort of thing that would occur from a
8    shot over 100 yards away.
9           You also have from that medical examiner, his
10   testimony that indeed he could see how somebody who was
11   right-handed could place the weapon in a way that indeed
12   it would result in the kind of entrance wound and exit
13   wound that Mr. Murray experienced.  And, Your Honor, he
14   also con -- and consistent with that perspective, that
15   Mr. Murray, indeed being right-handed, shot himself even
16   though it was from the left side of his head, he also
17   testified that -- and I apologize, I want to make sure I
18   get this correct.
19          That it was Mr. Murray's right hand that was
20   caked in blood.  Mr. Rasmussen speaks at great length
21   about the left hand of Mr. Murray having no blood on it.
22   Well, that's not the point.  The point is is that the
23   evidence was from the medical examiner that indeed it was
24   Mr. Murray's right hand that shot the weapon and that
25   indeed, consistent with that finding by the medical

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1   examiner, the right hand was covered with blood.

2            THE COURT:  Didn't the medical examiner also

3   conclude that he couldn't be absolutely sure that it was

4   at his own hand?

5            MR. PETRIE:  Yes, Your Honor.  I don't think he

6   testified about the left hand, but there was some

7   testimony -- some questioning from the Plaintiffs'

8   counsel --

9            THE COURT:  Right.

10           MR. PETRIE:  -- about whether or not the kind

11  of wound that Mr. Murray experienced could happen solely

12  from over 100 yards away and -- or from a contact wound.

13  And the gentleman said no.  But as the District Court

14  noted that Mr. -- or Dr. Leis, the medical examiner, he

15  was asked a hypothetical and that that hypothetical did

16  not include the consideration of additional evidence to

17  help inform his understanding of what happened.  And Dr.

18  Leis testified that it included that additional evidence

19  that he was aware of, that had been brought to his

20  attention, that indeed when all was said and done, this

21  was a contact wound that Mr. Murray experienced at close

22  distance, not from over 100 yards away.

23           THE COURT:  So we really just don't know

24  whether it was suicide or whether it was an officer-

25  caused gunshot.  We have lots and lots of cobbling

EXHIBIT A

 1    together pieces of evidence that don't totally fit, we

 2    have inferences that each of us makes differently at this

 3    point.  So how do we get from A to Z here?  I don't

 4    believe default judgment is the right answer.  You don't

 5    either.  I don't believe motion to dismiss, at this

 6    point, is the right answer and maybe never.  So we have

 7    to figure out how to do this.

 8            We do agree, I think, that we can't use the

 9    conclusions of the District Court or the 10th Circuit.

10    We have direction from the Court of Appeals for the

11    Federal Circuit, which is binding on this Court, that we

12    have to do spoliation first, but not really a lot about

13    the standards for spoliation or who has the burden or

14    whatever, but just that we have to do it.  And then we

15    have the potential that if spoliation is resolved and

16    doesn't come out in favor of the Government, that we then

17    could -- let me go to this footnote because I misquote

18    it.  Hold on a second.  Let me just get there again.

19            "That if the CFC determines that the federal

20    officer spoliated evidence, we leave it to the sound

21    discretion of the CFC to decide in the first instance

22    which of its findings, if any, were affected by the

23    spoliation and which were not."

24            We also have the direction that "the CFC

25    may" -- and, again, I'm reading from the opinion of the

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    Federal Circuit -- "reconsider the application of issue
2    preclusion if the CFC concludes on remand that spoliation
3    sanctions are not appropriate or that the appropriate
4    sanctions would not change the evidential landscape for
5    particular issues."  So we've got this very long, drawn-
6    out potential procedure that the Federal Circuit has
7    scoped for us.
8             I guess what I'm looking for is a way to get
9    from A to Z.  So one of the things that I won't do is
10   speculate without going through careful steps regarding
11   collection of evidence and trying to come to some
12   conclusions that at least have some support.  Because,
13   otherwise, whichever party loses is, quite justifiably,
14   going to go back to the Circuit and then we play remand
15   games again, which obviously none of us want to do.  And
16   that would be within the Circuit's right if we have made
17   inferences, snap decisions, jumped from A to Z without
18   the middle being explained.
19            So is what we should do here -- and here's what
20   I think I'm going to propose.  Obviously, I have
21   suggested to you all that you need to talk to each other
22   and figure out whether this really makes sense to go
23   through all these many and belabored steps and I gather
24   that both sides are pretty dug in.  Is the United States
25   completely opposed to some kind of settlement?

EXHIBIT A

Debra Jones, et al. v. USA                                              4/12/2018

1              MR. PETRIE:  Your Honor, at this point, we have
2     not discussed settlement.
3              THE COURT:  All right.  What I get from the
4     Department of Justice normally -- and I gather that
5     settlement or not settlement is within the purview of the
6     Department of Justice once you're in Federal Court.  When
7     I was at the Department of Interior, that used to gall me
8     to no end and I definitely ended up in the Attorney
9     General's Office on at least one occasion saying no, yes
10    or whatever it happened to be in that case because I
11    happen to know him pretty well.  So I was fortunate.
12             But the point being, I think it is something
13    that both sides should certainly consider here.  I think
14    both sides have unrealistic expectations of what they can
15    achieve.  I think the Plaintiffs have been through
16    horrible times and the litigation makes it worse, without
17    any question, and the belief firmly in a family member
18    not committing suicide.  I get that.  And the rest of
19    these proceedings aren't going to make it any easier and
20    I think the family has to come to a realistic
21    understanding of what's involved in the future as we try
22    to resolve this case.
23             The best case to get that, frankly, is from
24    your attorney, for him to explain to you the steps we're
25    now talking about and what the limitations are for a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    court in this situation, which do not include recognizing

2    that this is a horrible thing that happened, not -- we

3    can't really take cognizance with -- in a court of what

4    we're calling equity, which means our emotions, our

5    feelings of being sorry, our feelings of wishing that

6    there was some easy resolution for the family or --

7    whether it's monetary or otherwise, that doesn't get us

8    there.  We have to follow the guidance of the statutes

9    and the case precedent and the law and sometimes the law

10   is a bit cruel, frankly.

11           On the other side of that, I look at this crime

12   scene and I say, this is a mess.  I have a great deal of

13   respect for the FBI, but this is a mess.  I have respect

14   obviously for the Department of Interior, but this is a

15   mess.  And trying to figure it out, it's not been made

16   easier for any of us here in the courtroom by the remand,

17   but we have to deal with it.  So what I'm going to

18   propose to you, frankly, is that we put together a path

19   that you all would propose to me as to how we get from

20   where we are to where we need to go on the issues of

21   spoliation, first of all.  Then we'll worry about the

22   rest of it.  But I think the rest of it will come,

23   frankly, from what I can see here.

24           I don't know that based on what I've got at

25   this point that I see a clear path that there either was

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    spoliation or there wasn't spoliation.  I see a mess.

2    That opens up the door for spoliation, certainly.  But

3    we're going to have to go item by item by item by item.

4            I think that you all have to talk on a lot of

5    things.  Possible settlement, a path to resolution of

6    spoliation, a path to resolution of the case as a whole

7    after spoliation.  And in order to do spoliation, I

8    think the first thing you all have to do is put together

9    an administrative record of these documents that Mr.

10   Petrie says are there, we've got to look at.  We have

11   some of them from the earlier case, but I don't believe

12   we have all of them.  And so what I need -- because we

13   don't have all of them on some of the items that were now

14   on the spoliation list, for lack of a better descriptive

15   term.

16           So put together an administrative record that

17   has as much of the evidence that is cognizable without

18   the conclusions by the District Court, just the raw

19   evidence, whether it's deposition testimony, whether it

20   is coroner's reports, whether it is any other police

21   reports or FBI reports or BIA reports that were more

22   contemporaneous to the time, and then talk with each

23   other first and then talk about the experts you would

24   need, if any, and you can decide obviously for yourselves

25   on each side whether you want an expert or not.  Again, I

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    won't force you to, but, you know, we do know that very

2    often when one side has experts and the other doesn't,

3    that doesn't come out so well.  But sometimes the expert

4    is not relevant and then it doesn't matter.

5            So I think what we have to do -- we're

6    certainly not ready.  And the papers that you both filed

7    don't get me to a point where I have sufficient

8    information to decide this even close.  So it would be

9    nice if we could -- I would love to do a default judgment

10   and be done with it, but it's the wrong answer.

11           So, you know, we are looking at some serious

12   effort on the part of both sides.  I don't think this is

13   clean on either side.  I mean, you know, you've got

14   someone running away from an attempted arrest or two

15   someones.  You've got a crime scene presumably that the

16   FBI at some point was responsible for that wasn't handled

17   in a particularly exemplary fashion in any event, and

18   you've got huge gaps.  So how we fill in some of those

19   gaps is what we're going to have to do.

20           So just off the top of your heads, how quickly,

21   Mr. Rasmussen and Mr. Petrie, do you think you can get an

22   administrative record to it, obviously well indexed,

23   consecutively paginated -- I don't want to see numbers 1

24   to 10 over the first document and then 1 to 10 over the

25   second document; I want continuous pagination so we all

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    are able to talk about the same pages when we do deal

2    with it -- proposal for experts, and then we'll get back

3    together, frankly, after we have a chance to look at it

4    and see if it's a better path to resolving these

5    difficult issues.

6              The issues are difficult.  You know, the events

7    occurred a long time ago, so the odds of, you know, some

8    of the actors even being available or, if available,

9    having any realistic memory I think are probably remote.

10   If you find somebody like that, that's fine, who was at

11   the scene, not the people who are going to give the

12   coloration.  We're beyond coloration here.  We don't need

13   the coloration testimony.  What we need is actual

14   testimony.  If there's somebody who really is -- memory

15   then, it becomes obviously credibility because that's a

16   huge issue with that much gap time.  But contemporaneous

17   documents, reports, whatever, that would probably be our

18   best bet.

19             How long do you think you need, the two of you?

20   You're going to have to work together to get a joint

21   appendix.

22             MR. RASMUSSEN:  Yes.

23             MR. PETRIE:  Your Honor --

24             MR. RASMUSSEN:  And we work well together.

25             MR. PETRIE:  Yes.

EXHIBIT A

Debra Jones, et al. v. USA                                      4/12/2018

```
 1              THE COURT:  No, I'm not questioning that.
 2              MR. PETRIE:  Your Honor, may I propose that we
 3      give you an update in what, a number of days, a week, so
 4      we can compare notes and get some sense of --
 5              THE COURT:  I have no problem with that at all.
 6      That's fine.
 7              MR. PETRIE:  That would be a good discussion,
 8      yeah.
 9              THE COURT:  That's fine.  And, you know, the --
10      it's kind of odd here because the more information we
11      get, it could work either way.  You know, you need the
12      information to carry your burden of proof, but the
13      Government needs the information to support what seems a
14      little bit incredulous to me right off the bat in terms
15      of responsibilities and whatever.  So I think, you know,
16      some of those manuals needs to be in there as well.  I
17      mean, all of this -- it's a -- it's a situation that I
18      wish we didn't have to tackle in this way, frankly, but I
19      just don't know any other way to do it without making
20      huge guesses and ending up back in the Court of Appeals.
21      And that's the one thing we have to avoid.
22              So, yeah, you know, clearly, the better that
23      appendix is, the more likely we can do that on paper or
24      maybe with the experts if that is something that the
25      parties think would be helpful.
```

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1              MR. RASMUSSEN:  Yes.

2              THE COURT:  And talk to each other and see if

3    there's a resolution possible here because we're headed

4    into something that's going to take everybody a lot of

5    time to do it properly.  I don't know how to do things

6    improperly in this situation, or I hope I don't.  We just

7    have to go forward from here and try to work it out.  But

8    I'd say there's risk for everybody on this one in terms

9    of losing, in terms of getting negative press, so to

10   speak.  You know, I think we just have to move forward.

11   This is not a clean situation on any end.

12             So you all have -- how much time necessary to

13   confer with each other?

14             MR. PETRIE:  What do you need, do you think?

15             MR. RASMUSSEN:  Well, I was thinking if we

16   could submit something a little over a week -- like on

17   Monday so we have a good --

18             MR. PETRIE:  Is that a week from this Monday

19   or --

20             MR. RASMUSSEN:  Yes.

21             MR. PETRIE:  How does that square with what you

22   guys got?  So that would be the 23rd.

23             THE COURT:  So that would be the?

24             MR. RASMUSSEN:  That's right.

25             THE COURT:  A week from today or a week and a

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1    half is what you're saying?

2              MR. PETRIE:  A week from -- yeah, a week from

3    this coming Monday.

4              THE COURT:  That's the 23rd.

5              MR. RASMUSSEN:  Yes.

6              MR. PETRIE:  The 23rd.

7              THE COURT:  Okay, all right.  And then we'll

8    take a look at it and try to digest it and then we'll

9    probably schedule another status conference.  Now, I'm --

10   you know, we're a national court, so Mr. Rasmussen, we

11   can do this sort of thing on the phone very easily and

12   figure out the schedule.  So it's really up to you more

13   than anybody else here as to whether you want to do it in

14   person or on the phone and I'll mostly defer.

15             Now, on an oral argument or on -- you know,

16   once we get to the end of this, I'll probably want to do

17   it in person.  But in terms of scheduling or figuring out

18   next steps, we can easily place a phone call to you and

19   your Plaintiffs are certainly welcome to, I guess, go to

20   your office and participate if that's -- is that close to

21   where they are or not?

22             MR. RASMUSSEN:  No.

23             THE COURT:  Well, the other option is to -- you

24   know, we can add additional phone numbers.  We can go up

25   to six, I think.

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

1              MR. RASMUSSEN:  Okay.

2              THE COURT:  And you're in from Colorado as

3       well?

4              MR. PETRIE:  I am, and I was -- a little side

5       note.  I was comparing notes with Mr. Rasmussen before we

6       started today and I literally live about six blocks away

7       from their offices.  So --

8              THE COURT:  Well, you know, either way.  I

9       guess, you know, then -- I wasn't focused until I just

10      got a note on the fact that you're in Colorado as well.

11      But, you know, then if you want an in person, we can do

12      an in person.  If he wants an in person, if either one of

13      you wants an in person, we'll do an in person here.  If

14      not, if you both agree that it can be sufficiently

15      handled over the phone, then we'll do that.

16             Mr. Rasmussen, do you want to turn to your

17      Plaintiffs and see if there's anything they would like

18      explained further or any questions they have?  Because

19      they are immediately impacted, obviously.

20             MR. RASMUSSEN:  I've got a lot to explain to

21      them.  Is there anything you have for the Court?  No,

22      we're good.  Thank you.

23             THE COURT:  Well, my sympathy to you for your

24      loss and we'll try to figure this one out.  It's not

25      easy.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A

Debra Jones, et al. v. USA                                    4/12/2018

```
1              All right, thank you.  Safe trip back to
2      Colorado, everybody --
3              MR. RASMUSSEN:  Thank you for your time, Your
4      Honor.
5              THE COURT:  -- and back to your homes.  Thank
6      you.
7              (Whereupon, at 4:38 p.m., the hearing was
8      adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT A

88

Debra Jones, et al. v. USA                                    4/12/2018

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3           I, Elizabeth M. Farrell, court-approved

 4    transcriber, certify that the foregoing is a correct

 5    transcript from the official electronic sound recording

 6    of the proceedings in the above-titled matter.

 7

 8

 9

10    DATE:   4/16/2018              S/Elizabeth M. Farrell

11                                   ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT A